JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Christina Alicia Lynch

**DEFENDANTS**

Timothy Ward, Ahmed Holt, Sharon Lewis, Javel Jackson, and Georgia Department of Corrections

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Charles "Lyra" Foster
120 Scott Blvd, Decatur GA 30030

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [x] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Insufficient Medical Care for Transgender Inmate

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
12/27/2021

SIGNATURE OF ATTORNEY OF RECORD
*Lyra Foster*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)    County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)    Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.    Origin.**  Place an "X" in one of the seven boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.    Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

_____

**CHRISTINA LYNCH,**

        **Plaintiff,**

**v.**                                 **Case No.**

**TIMOTHY WARD, individually and in his official capacity as Commissioner of the Georgia Department of Corrections; SHARON LEWIS, individually and in her official capacity as the Statewide Medical Director of the Georgia Department of Corrections; JAVEL JACKSON, individually and in her official capacity as Director of Mental Health of the Georgia Department of Corrections; AHMED HOLT, individually and in his official capacity as Assistant Commissioner, Facilities Division, of the Georgia Department of Corrections;**

        **Defendants.**

_____

## <u>COMPLAINT</u>

COMES NOW, Plaintiff CHRISTINA ALICIA LYNCH who, by and through her undersigned attorneys, states and alleges as follows:

## **INTRODUCTION**

1.    Christina Lynch is a transgender woman who—despite having successfully sued officials from the Georgia Department of Corrections ("GDC"), including Defendant Statewide Medical Director Sharon Lewis, for constitutional violations in 2015—is once again trying to survive brutal and unrelenting abuse and mistreatment as a result of Defendants' actions and omissions.

2.    Ms. Lynch's 2015 lawsuit, Lynch v. Lewis, 2015 U.S. Dist. LEXIS 35561, 2015 WL 1296235, challenged GDC's policies denying transgender women affirming medical treatment and  of failing to protect transgender people from sexual assault and failing to provide them adequate treatment for gender dysphoria while in GDC custody.

3.    In Ms. Lynch's case, the court found (1) she has a gender identity disorder (GID); (2) Defendants were aware of Plaintiff's GID diagnosis, past use of hormones, and her medical need to continue hormone treatments; (3) Plaintiff had attempted to harm herself as a result of the denial of treatment and is at risk of serious future harm without treatment; (4) the medical community recognizes hormone therapy as an appropriate treatment for GID; and (5) Defendants knowingly refused to provide Plaintiff with the medically necessary hormone treatment. Id. at *11.

4.      As a result of inadequate housing and protection, Ms. Lynch has been brutally and repeatedly sexually assaulted by men in the GDC facilities where she is housed. Despite knowing about Ms. Lynch's heightened risk of sexual assault and her repeated brutalization, GDC officials, including Defendant Statewide Medical Director Sharon Lewis, the former GDC Commissioner, and the wardens at her prisons, failed to protect her.

5.      Likewise, during GDC's incarceration of Ms. Lynch, which led to her 2015 suit, Defendant Sharon Lewis, GDC's Statewide Medical Director, and other GDC officials refused to provide Ms. Lynch with any treatment for her gender dysphoria, despite knowing that their failure to do so was causing Ms. Lynch physical pain and enormous mental distress. This distress led to self-harm, including suicidal ideation and suicide attempts. As part of settlement negotiations in Ms. Lynch's 2015 case, the GDC agreed to provide her hormone treatment, assessment for facial hair removal, and other treatments assessed as the basic standard of care by the World Professional Association for Transgender Healthcare (WPATH), the medical standard of care recognized by the 11th Circuit for inmates with a GID. The GDC never lived up to this agreement, despite Ms. Lynch having agreed to settle and release the GDC from liability.

6.      Following a parole violation, Ms. Lynch once again finds herself at the mercy of GDC which has—once again—failed to provide her with the medical treatment

that is hers by right under the United States Constitution and the terms of the settlement agreement the GDC signed with Ms. Lynch in 2015. They have also failed to protect her from relentless sexual victimization. Not only has the GDC failed to provide her with the court-recognized medical care from her 2015 suit, they are in violation of their settlement agreement with Ms. Lynch.  As a result, she has been forced to file this new lawsuit, Lynch II.

7.      The Lynch II Defendants are undeniably aware of the significant risks of sexual assault Ms. Lynch faces as a transgender woman housed in men's prisons. Yet Defendants have again refused her requests to be housed in a women's facility and have again placed her in a series of men's prisons where she lives in constant fear of sexual abuse—fears that have repeatedly materialized.

8.      In addition to Defendants' awareness of Ms. Lynch's high risk of sexual assault and her need for adequate medical treatment for her gender dysphoria, Ms. Lynch, through counsel, sent GDC counsel Jennifer Ammons three notices and demands for compliance with Constitutional requirements for treatment and housing of Ms. Lynch, along with their violations of the settlement agreement previously signed by both the GDC and Ms. Lynch.

9.      Because of Defendants' housing decisions and practice of refusing to house transgender women in women's prisons or provide similarly safe housing that does not involve solitary confinement (hereinafter "non-segregated housing placement").

10.     The GDC's denial of medical care to Ms. Lynch according to the medical community, the Eleventh Circuit, and now the United States Department of Justice, has injured her physically and emotionally, causing her tremendous pain and ongoing suffering.

11.     Defendants have refused to provide Ms. Lynch with constitutionally adequate treatment for gender dysphoria, which has imperiled her physical and mental health. As a result of GDC's healthcare denials, Ms. Lynch has experienced severe physical and mental anguish, including depression, anxiety, suicidal ideation and suicide attempts, and self-harm.

12.     The abuse and neglect that Ms. Lynch has experienced are all the more egregious because Defendants have willfully ignored a prior judicial finding that some of the very same conduct Defendants repeat here qualifies as cruel and unusual punishment under the Eighth Amendment and a violation of clearly established constitutional rights. Further. The Defendants have demonstrated their conscious awareness of the accepted medical standard to which they are refusing to hold themselves: they agreed to abide by such a standard expressly when entering into a

settlement agreement with Ms. Lynch in her 2015 case. Additionally, in Spring of 2021 the Department of Justice issued an advisory opinion explicitly characterizing treatment such as Ms. Lynch has received as cruel and unusual punishment under the Eighth Amendment.

13.    Ms. Lynch's constant fear and danger of sexual victimization is in part the result of Defendants' long-standing and widespread practice of housing transgender women like Ms. Lynch in men's prisons without adequate safeguards despite their individual circumstances and the obvious risk of sexual abuse they face as women housed in men's prisons. Through this policy and practice, Defendants treat Ms. Lynch differently, without legitimate justification, from similarly situated cisgender women (non-transgender women) who are housed in women's facilities and therefore shielded from sexual predation from incarcerated cisgender men.

14.    Having fully exhausted her administrative remedies to no avail, Ms. Lynch seeks judicial relief pursuant to 42 U.S.C. § 1983 to ensure that Defendants take reasonable steps to protect her from sexual assault and provide her constitutionally adequate medical care.

15.    In other words, Ms. Lynch seeks a court order requiring Defendants to do what they know they must do, what they have previously been notified is their constitutional obligation to do, but what they have simply refused to do.

## JURISDICTION AND VENUE

16.    This action arises under 42 U.S.C. § 1983.

17.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction to federal district courts in civil actions arising under the U.S. Constitution and the laws of the United States, and § 1343(a)(3), which confers original jurisdiction to federal district courts in civil actions to redress the deprivation, under color of any State law, of any right secured by the U.S. Constitution. This action seeks to redress the deprivation of rights secured by the Eighth Amendment and Fourteenth Amendment to the U.S. Constitution.

18.    This Court has personal jurisdiction over each Defendant because each is a resident of Georgia who was employed in Georgia and acted under color of state law at all times relevant to this action.

19.    In addition to the Northern District, venue is proper in the Middle District of Georgia ("District") under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because multiple Defendants reside in this District and because a substantial part of the events giving rise to Ms. Lynch's claims occurred in this District.

## PARTIES

20.    Plaintiff Christina Alicia Lynch is a thirty-one-year-old Black transgender woman from

Dekalb County, Georgia who is currently in GDC custody. She was also the lead plaintiff in Lynch Ms. Lynch, a 2015 lawsuit challenging unconstitutional conditions of confinement and medical treatment experienced by transgender people in GDC custody.

21.    At all times relevant to the events at issue in this case, Defendant Timothy C. Ward is and was the Commissioner of GDC. In his position as Commissioner, Defendant Ward exercises final policy and decision-making authority at GDC, including over policies that relate to the care, treatment, and housing placement of transgender people and people with gender dysphoria in

GDC. Defendant Ward also exercises control over all personnel who enforce those policies. Defendant Ward adopts, enforces, and ratifies policies, customs, and widespread practices concerning the housing and safety of transgender people and the evaluation and treatment of

gender dysphoria. Defendant Ward has the authority to issue directives concerning the care, treatment, and housing placements of transgender individuals in GDC custody. Defendant Ward has the authority to issue directives concerning the training and supervision of GDC personnel. Defendant Ward is sued in his individual and official capacities.

22.    At all times relevant to the events at issue in this case, Defendant Sharon Lewis is and was the Statewide Medical Director for GDC and a member of the Statewide Classification Committee. In these roles, Defendant Lewis exercises final policy and decision-making authority regarding the care, treatment, safety, and housing placements of transgender people and people with gender dysphoria in GDC. Defendant Lewis controls, trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant Lewis adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant Lewis is also responsible for approving or denying GDC treatment plans and requests for gender dysphoria treatment; responding to identified problems, including grievance appeals; determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant Lewis is sued in her official and individual capacities.

23.    At all times relevant to the events at issue in this case, Defendant Javel Jackson (hereinafter "Defendant J. Jackson") is and was the Statewide Mental

Health Director at GDC and a member of the Statewide Classification Committee. In these roles, Defendant J. Jackson exercises final policy and decision-making authority regarding the care, treatment, safety, and housing placements of transgender people and people with gender dysphoria in GDC. Defendant J. Jackson controls, trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant J. Jackson adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant J. Jackson is also responsible for approving or denying GDC treatment plans and requests for gender dysphoria treatment; responding to identified problems; determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant J. Jackson is sued in her official and individual capacities.

24.    At all times relevant to the events at issue in this case, Defendant Ahmed Holt is and was the Assistant Commissioner of the Facilities Division at GDC and a member of the Statewide Classification Committee. In these roles, Defendant Holt exercises final policy and decision-making authority regarding the safety and

housing placements of transgender people and people with gender dysphoria in GDC. Defendant Holt controls, trains, and supervises GDC personnel responsible for housing and safeguarding people in GDC custody, including transgender people and people who have experienced sexual assault. Defendant Holt adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. He is also responsible for determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of incarcerated transgender individuals. Defendant Holt is sued in his official and individual capacities.

25.    At all times relevant to the events at issue in this case, Defendant Robert Toole is and was the Director of Field Operations at GDC and a member of the Statewide Classification Committee. In these roles, Defendant Toole is responsible for overseeing daily operations of GDC facilities and assisting with determinations concerning where transgender people are housed. Defendant Toole had a duty to reasonably protect incarcerated transgender people like Ms. Lynch from a substantial risk of serious harm. Defendant Toole is sued in his official and individual capacities.

26.    At all times relevant to the events at issue in this case, Defendant Randy Sauls is and was the Assistant Commissioner of the Health Services Division at GDC. In this role, Defendant Sauls exercises final policy and decision-making authority regarding the care and treatment of transgender people with gender dysphoria. Defendant Sauls controls, trains, and supervises GDC healthcare personnel, including Defendants Lewis and J. Jackson, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant Sauls is responsible for monitoring and evaluating the quality and appropriateness of care, ensuring that people in GDC custody receive necessary treatment plans and treatment for gender dysphoria, and responding to identified problems. Defendant Sauls is sued in his official and individual capacities.

27.    At all times relevant to the events at issue in this case, Defendant Grace Atchison is and was the Statewide Prison Rape Elimination Act ("PREA") Coordinator and a member of
the Statewide Classification Committee. In these roles, Defendant Atchison controls, trains, and supervises GDC PREA compliance managers and is responsible for ensuring that GDC personnel, including wardens, take adequate steps to respond to

and prevent sexual assault and abuse at GDC facilities. Defendant Atchison exercises final policy and decision-making authority regarding the safety and housing placements of transgender people and people with gender dysphoria in GDC. Defendant Atchison adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant Atchison is also responsible for determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault against incarcerated transgender people; reviewing sexual abuse incident investigations and recommendations and ensuring implementation of facility improvements to minimize similar incidents of sexual abuse; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant Atchison is sued in her official and individual capacities.

## FACTUAL ALLEGATIONS

### Background on Ms. Lynch

28.    Ms. Lynch is a thirty-one-year-old woman. She is also transgender.


29.    A person's sex is determined by sex-related characteristics, including hormones, external and internal morphological features, external and internal

reproductive organs, chromosomes, and gender identity. These characteristics are not always in alignment.

30.    Gender identity—a person's core internal sense of their own gender— is the primary factor in determining a person's sex. There is a medical consensus that gender identity is innate and immutable.

31.    The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external reproductive organs at the time of birth.

32.    Transgender individuals are people whose gender identity diverges from the sex they were assigned at birth. Cisgender individuals are people whose gender identity aligns with the sex they were assigned at birth.

33.     Ms. Lynch was diagnosed with gender dysphoria while in GDC custody in 2013.[1]

34.     Gender dysphoria is a serious medical condition that appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). Gender dysphoria causes severe psychological suffering and can lead to physical injury when it is not properly treated.

35.     As part of Ms. Lynch's 2015 Settlement, the GDC agreed to provide Ms. Lynch all necessary treatments for her gender dysphoria, explicitly mentioning facial hair removal.

36.     The GDC acted in bad faith against Ms. Lynch, explicitly mentioning facial hair removal and other treatments aside from hormone replacement therapy to induce her to settle her claim. Subsequently, they provided her with hormone replacement therapy and put off determination of whether facial hair removal was medically necessary.

_____

    1 The terms "gender identity disorder," "transsexualism," and "transsexual" are used interchangeably in GDC records to describe gender dysphoria, along with people living with the condition, and should be treated as synonyms for purposes of this Complaint.

37.     The GDC did not promise in their settlement agreement to evaluate which treatments they would consider medically necessary, they promised to provide her treatment under the accepted medical standard of care.

38.     The GDC allowed Ms. Lynch to sign settlement documents as an unsophisticated party, agreeing to voluntarily dismiss her lawsuit, under the belief that she would receive the particular care she requested, rather than "evaluation," all the GDC was in fact willing to offer.

39.     Nearly every first-semester law school curriculum includes the basic precept that a contract is void if one party's performance is entirely voluntary upon its own discretion.  As such, the GDC has either breached its settlement agreement with Ms. Lynch, or never entered into a valid contract with her in the first place, fraudulently inducing her to drop her 2015 suit.

40.     July of 2015: Assistant Attorney General Deborah Nolan Gore agreed that the GDC would provide Ms. Lynch hormone therapy and facial hair removal, in a letter dated July 2 of that year.

41.     In 2015, Ms. Lynch spoke with Dr. Raymond Moody at Valdosta State Prison, pursuant to the letter authored by AAG Gore, and Ms. Lynch was scheduled for a dermatologist consult.

42.     Because of the severity of her Gender Dysphoria, Ms. Lynch had a mental health crisis and attempted to auto-castrate herself. Said breakdown and auto-castration caused Ms. Lynch to be transferred to Georgia State Prison (GSP) in August of 2015, approximately.

43.     Sometime between late 2015 and early 2016, Ms. Lynch was sent to see a dermatologist, after many months of delay; Dr. Florentina at Augusta State Medical Prison was very nice, very helpful. In the end, Dr. Florentina made a recommendation for further consultation and to be scheduled for facial hair removal, if the GDC would authorize. Her recommendation can be found in Ms. Lynch's archived GDC records, from prior to being returned to prison in 2018 for parole violation.

44.     After this consultation with the dermatologist, the GDC proceeded to stalled Ms. Lynch for two months. Then Dr. Sharon Lewis informed Ms. Lynch would not

be receiving facial hair removal because it is considered by GDC to be a cosmetic procedure, not a medical one.

45.     According to the standard of care recognized by the Eleventh Circuit, the SoP of the World Professional Association for Transgender Healthcare, procedures typically thought of as "cosmetic" are actually medically vital for the treatment of gender dysphoria.

46.     Further, evaluation of the necessity of requested treatments was not what the GDC promised Ms. Lynch in her 2015 settlement negotiations, they promised to provide all treatments necessary to alleviate her gender dysphoria.

47.     Ms. Lynch filed a grievance thereafter. It was denied by the GDC Office of Health Services; in other words, the office of Dr. Sharon Lewis.

48.     In April of 2016 Ms. Lynch wrote letters requesting treatment addressed each to: Mr. Robert Toole, Dr.Sharon lewis, Ms. Jennifer Ammons, and the Office of the Commissioner.

49.     Ms. Lynch would again write letters to these same individuals in August of 2016. She ceased pursuing treatment only when she was in consideration for transfer to transitional housing.

50.     However, while at Johnson State Prison for the RSAT program in later 2016 and 2017, the medical director and nurse practitioner, Dr. Cowen and Director of Nursing Lindsey advocated for Ms. Lynch with Dr. Sharon Lewis, and an inquiry about the treatment was submitted to her office and rejected.

51.     After completing RSAT in 2017, Ms. Lynch was sent to Telfair State Prison to await Transitional Center bedspace.

52.     While at Telfair State Prison, Ms. Lynch was raped. Ms. Lynch was threatened with losing her placement in a transitional center if she pursued the sexual assault allegations. She was also threatened that pursuing justice for the assault would jeopardize her potential for parole.

53.     Finally, Ms. Lynch was sent to the Columbus Transitional Center in mid-2017. It was summer, late summer. Ms. Lynch began to again advocate for facial hair removal, as medical care at the TC is at the expense of an inmate. Ms. Lynch

asked the nurse and doctor at the TC to see if Ms. Lynch could finance the facial hair removal at my own expense. Dr. Sharon Lewis and Jennifer Ammons' informed the TC medical staff that Ms. Lynch was not allowed to receive cosmetic procedures and facial hair removal is considered by GDC to be cosmetic.

54.     September 2018: Ms. Lynch was returned to GDC custody for a parole violation.

55.     At Jackson Diagnostic Prison, Ms. Lynch identified as transgender and began requesting facial hair removal, breast augmentation, and vaginoplasty - as well as permission to grow  her hair and otherwise comport herself as a woman, though her hair had  had been cut upon re-entering the system.

56.     Unit Manager Smith advocated for Ms. Lynch, as well as the Deputy Warden of Care and Treatment contacting Offender Administration and Office of Health Services. Ms. Lynch also requested to be housed as a woman, not a man. Ms. Lynch was never given a response by the state, and instead was taken off of mental health hold and sent to a general population prison, Macon State Prison.

57.    Throughout the duration of 2019, Ms. Lynch would advocate strenuously for facial hair removal, breast augmentation, vaginoplasty, and for permission to grow her hair out.

58.    Ms. Lynch filed a grievance, which was denied by Warden Perry, and then appealed - which appeal was in turn denied by Dr. Sharon Lewis' division.

59.    Medical staff at Macon State Prison would contact Dr. Sharon Lewis and inquire/advocate on my behalf several times. Ms. Maxi, director of nursing, and Dr. Cowen were directed by Dr. Sharon Lewis to not provide the requested treatments.

60.    On July 27th, 2020, Ms. Lynch was sexually assaulted, held against a wall by two inmates in her cell and groped and threatened.

61.    The following day, Tuesday July, 28th, 2020, Ms. Lynch told the Lieutenant that she had been sexually assaulted. She was accused of fabricating the assault and was denied any sort of protective custody.

62.    In reaction to the trauma of the assault, as well as the denial of the individuals who were supposed to be protecting her, Ms. Lynch attempted suicide.

63.     Ms. Lynch was initially placed in solitary in reaction to her suicide attempt. She was also put on a mental health hold.

64.     While on mental health hold, Ms. Lynch wrote no less than two letters to both Dr. Sharon Lewis and Dr. Jackson, dated August 16th and October 1st, requesting vaginoplasty, facial hair removal, breast augmentation, and growing of her hair. Ms. Lynch also complained to Dr. Jackson in both letters about the severely unconstitutional conditions of her confinement, according to recognized Eleventh Circuit precedent. Ms. Lynch received no response to these letters from either Dr. Lewis or Dr. Jackson.

65.     In mid October of 2020, Ms. Lynch was released from that mental health hold at Valdosta and was transferred to Central State Prison. Upon arriving Ms. Lynch began informing medical staff and mental health staff that she wanted to be evaluated and assessed for facial hair removal, vaginoplasty, breast augmentation, and growing her hair out.

66.     Ms. Lynch wrote to Dr. Sharon Lewis and Dr. Jackson on December 6th, 2020. Ms. Lynch also wrote to Ms. Jennifer Ammons' again January 4th, 2021. To

date, Ms. Lynch still has received no response to these letters, from any of the recipients.

67.     From April to August of 2021, Counsel for Ms. Lynch sent several emails to Jennifer Ammons requesting a change in procedure and informing her of the possibility of suit.

68.     Also in April of 2021, the Department of Justice issued an advisory that denial of treatment under the World Professional Association for Transgendered Health ("WPATH") standard of care constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution.[2]

69.     Counsel for Ms. Lynch informed the GDC repeatedly that they were in violation of Ms. Lynch's Eight Amendment rights.

---

[2] 159.    The National Commission on Correctional Healthcare, the U.S. Department of Justice ("Department of Justice"), and the National Institute of Corrections have all endorsed the Standards of Care as the accepted medical standard for the treatment of gender dysphoria in carceral settings.

70.    In July of 2021, Dr. Ren Massey, Co-Chair of WPATH, agreed to provide testimony about the WPATH standard, and therefore the standard of care the GDC must meet to not be in violation of Ms. Lynch's Eighth Amendment Rights.[3]

71.    The GDC's policy (SOP 220.09) concerning transgendered inmates permits a medical team to evaluate transgendered inmates for necessary treatment.

72.    This policy mentions only treatment with hormone replacement therapy, and in the GDC's denials of Ms. Lynch's requests for treatment, it is clear that these "evaluations" are actually exclusively for hormone replacement therapy.

73.    This hormones-only policy is contrary to the WPATH standard, which recognizes myriad treatments as necessary for care. It is also in breach of the settlement agreement entered into by Ms. Lynch with GDC in 2015.

## COUNT I

---

[3] The Standards of Care establish that treatment for gender dysphoria consists of the following medical treatments, customized to meet individual needs and provided in a manner sufficient to alleviate a patient's dysphoria symptoms:

a.    Changes in gender expression, including through pronoun usage, grooming (including, e.g., hair removal for transgender women), and dress to match one's internal gender;

b.    Receiving hormone therapy to promote the development of secondary sex characteristics that affirm one's gender;

c.    Obtaining gender affirming/confirming treatments and surgical procedures.

**Eighth Amendment Under 42 U.S.C. § 1983—Failure to Provide Medical Care**

*For Damages and Declaratory and Injunctive Relief Against Defendants*

74.    Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

75.    Included in the prohibition against cruel and unusual punishment protected by the Eighth Amendment to the U.S. Constitution is the provision of adequate treatment for a serious medical need while in the custody of the State.

76.    Defendants knew that Ms. Lynch has gender dysphoria, a serious medical need requiring treatment to avert a serious risk of physical and psychological harm. Defendants also knew that the medically accepted standards for the treatment of gender dysphoria are the Standards of Care prescribed by WPATH.

77.    Defendants knew from Ms. Lynch's medical records and the consensus recommendations of the healthcare professionals who actually examined her, and from the Standards of Care recognized by the Eleventh Circuit that the medically necessary treatments for Ms. Lynch's gender dysphoria are hormone therapy in uninterrupted and therapeutic doses, accommodations related to her gender

expression (including female undergarments, commissary items, and grooming allowances), and hair removal treatments. They also knew Ms. Lynch required ongoing care and evaluations from mental health professionals qualified to treat gender dysphoria, including surgical treatments where necessary to alleviate her gender dysphoria.

78.    Defendants Lewis, J. Jackson, and Sauls knew that the Standards of Care require that gender dysphoria treatment be administered in a manner sufficient to alleviate severe symptoms, which in the case of Ms. Lynch include severe depression, suicidality, self-harm, and self-castration attempts.

79.    Despite this knowledge and Ms. Lynch's repeated requests for care, Defendants refused to provide Ms. Lynch medically necessary treatment in deliberate indifference to her serious risk of harm, while acting under color of state law.

80.    Instead, Defendants provided Ms. Lynch care that was so poor, cursory, grossly inadequate, and out of step with accepted professional norms that it constitutes a wanton infliction of pain, not medical treatment at all—placing Ms. Lynch at serious risk of harm and death from attempted self-castration and suicide.

81.     By failing to provide Ms. Lynch with treatment sufficient to alleviate her symptoms, Defendants failed to provide the minimally adequate care required to be provided to incarcerated transgender people.

79.     The actions and omissions of Defendants as described herein were made without the exercise of any individualized medical judgment whatsoever—based on the decision to take an easier but less efficacious course of treatment—and were so cursory and inadequate that they amount to no treatment at all.

80.     Defendant Lewis's actions were also wanton and malicious as they reflect a pattern of denying medically necessary care to people with gender dysphoria that began in Lynch I when she also served as Statewide Medical Director.

81.     As a direct and proximate result of Defendants' actions and omissions, Ms. Lynch has suffered physical injury and emotional harm.

82.     Ms. Lynch seeks injunctive and declaratory relief against Defendants in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

83.    Ms. Lynch's physical and emotional suffering will continue absent injunctive relief to abate Defendants' constitutional violations described herein.

84.    Ms. Lynch also seeks damages from Defendants in their individual capacities.

## COUNT II

### Eighth Amendment Under 42 U.S.C. § 1983—Policy, Custom, or Practice

#### *For Declaratory and Injunctive Relief Against Defendants Ward*

84.    Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

85.    GDC, through Defendants Ward, has adopted a practice, custom, or policy— the Hormones-Only Policy—limiting the gender dysphoria treatment available to incarcerated transgender people on a blanket basis, regardless of medical necessity.

86.    Defendants collectively adopted, ratified, and/or enforce the Hormones-Only Policy within GDC, despite knowing that it creates a substantial risk of suicide and serious self-harm for transgender women like Ms. Lynch, whose gender dysphoria is not adequately treated by hormone therapy alone.

87.    The Hormones-Only Policy adopted by Defendants Ward supersedes GDC's written policies on the management and treatment of gender dysphoria and has acquired the force of law. Defendants have also failed to properly train their staff concerning the medical needs of incarcerated people with gender dysphoria, despite knowing that application of the custom, practice, and policy outlined above would harm patients suffering from gender dysphoria and that harm was likely to continue absent training.

88.    The Hormones-Only Policy adopted by Defendants falls below the minimum accepted Standards of Care and the overwhelming medical consensus that gender dysphoria treatment must be individualized and that medically necessary care requires treatment sufficient to alleviate symptoms such as depression, suicidality, and attempted self-castration.

89.    The Hormones-Only Policy adopted by Defendants only supplies care that is grossly inadequate; is based on decisions to take an easier but less efficacious course of treatment; and is care so cursory as to amount to no treatment at all.

90.    Defendants knew that their refusal to authorize anything beyond the provision of hormone therapy to Ms. Lynch was tantamount to a denial of minimally adequate care because of Ms. Lynch's suicidality and repeated attempts to engage in self-castration.

92.    As a direct and proximate result of Defendants adoption and enforcement of the Hormones-Only Policy, Ms. Lynch has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

93.    Ms. Lynch seeks injunctive and declaratory relief against Defendants in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT III

## BREACH OF CONTRACT

### *For Declaratory and Injunctive Relief and Damages Against Defendants*

94.    Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

95.    Defendants entered into a Settlement Agreement with Ms. Lynch requiring them to provide her with necessary medical care in exchange for her release of the lawsuit.

96.    While facial hair removal is not explicitly mentioned in the Settlement Agreement, email communications will indicate that Ms. Lynch discussed this specific treatment with the GDC contemporaneously with her signing of the agreement.

97.    Though courts will not typically look beyond the "four corners" of a contract in construing its terms, a well-recognized exception exists for contracts where one party is sophisticated and represented by counsel and the other party is not.

98.    Ms. Lynch proceeded pro se against the GDC in her 2015 suit and was an unsophisticated party.

99.    Further, another exception to the "four corners" rule is where one party was induced by fraud to enter into the contract.

100.   Ms. Lynch was fraudulently induced to enter into her Settlement Agreement

with the GDC (**See COUNT IV- FRAUD IN THE INDUCEMENT**).


101.   The WPATH Standard of Care already existed and was referenced in District

Court decisions regarding Ms. Lynch's prior case (*see Lynch I*). Ms. Lynch explicitly

sued the GDC for medically necessary treatment under the WPATH standards.


102.   Defendants knew that any agreement entered into by Ms. Lynch necessarily

involved the WPATH Standard of Care. Their knowledge is established by

references to this standard in Ms. Lynch's *Lynch I* pleadings, and in District Court

deliberations to which the Defendants were a party.


103.   By refusing to provide Ms. Lynch with sufficient treatment under WPATH

standards, they are in breach of contract with Ms. Lynch.


104.   Ms. Lynch seeks injunctive and declaratory relief against Defendants in their

official capacities to prevent continued breach of the Settlement Agreement they

entered into with Ms. Lynch in 2015.

## COUNT IV

## FRAUD IN THE INDUCEMENT

*For Declaratory and Injunctive Relief and Damages Against Defendants*

105.   Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

106.   Defendants, sophisticated parties represented by counsel, entered into a binding settlement agreement with Ms. Lynch in 2015.

107.   Had Ms. Lynch refused to settle, her claim against Defendants for cruel and unusual punishment would have been decided based on prevailing medical care standards for individuals with gender dysphoria.

108.   In the Eleventh Circuit, that standard was and is the WPATH standard of care.

109.   In her briefs for the court in her 2015 case, Ms. Lynch detailed this standard at length. Prior to settlement, the court discussed the standard of care at hearing (**See Lynch I**).

110.   Defendants had actual notice of the WPATH standard of care, which includes not only hormone replacement, but facial hair removal, feminine presentation, breast augmentation, and other surgical procedures.

111.   Defendants were aware of this standard and what Ms. Lynch was seeking when they offered her evaluation for treatment as part of the 2015 settlement agreement.

112.   Ms. Lynch voluntarily dismissed her lawsuit under the clear understanding that she would be subject to the prevailing medical standard of care for persons with gender dysphoria.

113.   Subsequent to settlement, Ms. Lynch was stonewalled for months on treatments other than hormones. She was subsequently told facial hair removal and breast augmentation were unavailable to her because those procedures were cosmetic rather than medical.

114.   This is directly contrary to the WPATH standard of care, the standard to which Defendants knew or should have known they were to be held. (**See Massey Aff.**).

115.   If Defendants, having actual knowledge of the standard of care, entered into the settlement agreement in good faith and only later refused Ms. Lynch treatment

under WPATH standards after evaluation, they are in breach of contract with Ms.

Lynch. (**See Count III- BREACH OF CONTRACT**).

116.   If, however, Defendants, having actual knowledge of the standard of care,

entered into the settlement agreement with Ms. Lynch knowing that upon evaluation

she might receive less than WPATH-recommended treatment protocols, they

knowingly made a contract with Ms. Lynch while aware that her agreement to

release the suit was conditioned on a material falsehood.

117.   As Ms. Lynch was an unsophisticated party not represented by counsel, while

Defendants were represented by the entire office of the Attorney General of Georgia,

Defendants were well-situated to know the standard of care to which they were

subject.

118.   As such, Defendants are liable for fraudulent inducement as well as breach of

contract.

119.   Ms. Lynch seeks injunctive and declaratory relief against Defendants in their

official capacities to prevent continued breach of the Settlement Agreement they

entered into with Ms. Lynch in 2015, as well as any damages or sanctions against the state this Court sees fit to order as justice demands.

## COUNT V

## Eighth Amendment Violation Under 42 U.S.C. § 1983—Policy, Pattern, or Custom

### *For Declaratory and Injunctive Relief Against Defendants*

120.   Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

121.   Defendants knew that transgender women, including Ms. Lynch, are an identifiable group of incarcerated people who are frequently singled out for violent attack and/or sexual assault, abuse, and harassment when housed in men's maximum and medium security facilities.

122.   Defendants denied Ms. Lynch and other transgender women safe housing in women's facilities pursuant to the De Facto Placement Ban, which denies transgender women placement in female facilities with little to no exception, regardless of their individual circumstances and risks.

123.   Defendants and their predecessors adopted, ratified, and enforced the De Facto Placement Ban within GDC, despite knowing that it created a substantial risk of serious harm for transgender women like Ms. Lynch.

124.   By applying the De Facto Placement Ban to Ms. Lynch, placed her in a series of men's prisons without regard to her heightened risk of vulnerability and without taking reasonable and adequate actions to reduce the foreseeable risk of sexual assault.

125.   By applying the De Facto Placement Ban to Ms. Lynch, Defendants refused to meaningfully consider housing placement and safety transfer requests or to transfer Ms. Lynch and other transgender women to women's facilities even after notice of credible allegations of sexual assaults, threats, and foreseeable future risk.

126.   The De Facto Placement Ban that Defendants adopted and applied to Ms. Lynch displaces individualized risk assessments and judgment, supersedes other policies on the management, placement, and treatment of incarcerated transgender people, and has acquired the force of law.

127.   By establishing, maintaining, and/or otherwise applying their De Facto Placement Ban to Ms. Lynch and other transgender women, Defendants showed deliberate indifference to the substantial risk of serious harm these practices caused.

128.   There is no penological basis to apply the De Facto Placement Ban to deny Ms. Lynch a transfer to a female facility, or to refuse to provide her with a non-segregated housing placement that adequately protects her from the heightened risk of sexual assault she faces as a transgender woman in men's prisons.

129.   As a direct and proximate result of the De Facto Placement Ban that ratified and applied to Ms. Lynch while acting under color of state law, Ms. Lynch has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

130.   Ms. Lynch seeks injunctive and declaratory relief against Defendants in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

**COUNT VI**

**Fourteenth Amendment Equal Protection Violation Under 42 U.S.C. § 1983**

*For Declaratory and Injunctive Relief Against Defendants*

131.   Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:


132.   The Fourteenth Amendment's Equal Protection Clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.


133.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to heightened scrutiny.


134.   Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

135.   Discrimination   based   on   transgender   status   is   also   presumptively unconstitutional under the Equal Protection Clause and subject to strict, or at least heightened, scrutiny.

136.   Transgender people have suffered a long history of extreme discrimination in Georgia and across the country, in prisons and outside of prisons, and continue to suffer such discrimination to this day.

137.   Many, if not most, transgender and cisgender women who are incarcerated, including Ms. Lynch, have discernable feminine characteristics and secondary female-typical sex characteristics that place them at heightened risk of sexual assault if placed in men's prisons without adequate safeguards.

138.   Both transgender and cisgender women face substantially similar risks of sexual victimization if housed in men's prisons without adequate safeguards.

139.   Defendants knew that Ms. Lynch faced a substantially similar risk of sexual assault when housed in men's prisons as a cisgender woman would face in men's prisons.

140.   Disregarding these known safety risks, Defendants refused to place Ms. Lynch in a female facility, or similarly safe facility designed to protect her from the sexual victimization of incarcerated men.

142.   Defendants' actions and inactions in placing and keeping Ms. Lynch in men's prisons discriminates against her on the basis of sex.

142.   Defendants' actions and inactions in placing and keeping Ms. Lynch in men's prisons also discriminates against her based on sex stereotyping, namely, treating her as though she were a cisgender man based on the presumption that her gender identity and expression should align with her sex assigned at birth, and housing her in accordance with that perception. This sex stereotyping is based solely on Ms. Lynch's sex assigned at birth, disregarding her gender identity even though she is a woman and has had medical treatment to bring her body into alignment with her female gender identity.

143.   Defendants, acting under color of state law, intentionally and flagrantly discriminated against Ms. Lynch by placing her, and continuing to house her, exclusively in men's prisons without adequate safeguards, even though she faces similar risks as all other women in GDC custody.

144.   Defendants' actions as described herein were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Ms. Lynch a safe and appropriate placement in a female facility, based on her sex, gender identity, characteristics, risk factors, and her history of sexual assault in male GDC facilities. No legitimate penological interest is met by creating and enforcing these grooming and attire policies against Ms. Lynch, the GDC has simply created a trap of cruel and unusual punishment against Ms. Lynch: the state administers female standards of grooming, hair length, attire, and behavior for thousands of cisgender woman inmates, and no penological interest is furthered by denying these to Ms. Lynch. Alternately, if there is any penological interest in uniform enforcement of these standards in the mens' prisons in which Ms. Lynch has been housed, the GDC can easily avoid this issue by transferring her to a womens' facility for uniform enforcement of female-oriented standards.

145.   As a direct and proximate result of Defendants' actions, Ms. Lynch has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

146.   Ms. Lynch seeks injunctive and declaratory relief against Defendants in their official capacities to prevent the continued violation of her Fourteenth Amendment right to equal protection under Law.

## COUNT VII

### Eighth Amendment Violation Under 42 U.S.C. § 1983—Failure to Protect

#### *For Declaratory and Injunctive Relief Against Defendants*

#### *For Damages Against Defendants*

147.   Ms. Lynch incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

148.   The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. Included in the prohibition against cruel and unusual punishment is the right to be free from a known and substantial risk of serious harm, including sexual assault, while in the custody of the State.

149.   Each and every Defendant knew that Ms. Lynch faced a substantial risk of serious harm from sexual assault in GDC custody while housed in men's prisons. Defendants also knew the risks to Ms. Lynch were ongoing because she repeatedly experienced abuse and attacks following her 2018 return to custody.

150.   Due to the severity and obviousness of the sexual assault risks facing transgender people like Ms. Lynch in GDC custody, PREA and GDC's own written policies required that GDC officials carefully consider the housing placements of transgender people and take steps to mitigate their risk of sexual victimization, up to and including placement in a female facility.

151.   Contrary to the Eighth Amendment and the basic standards of human decency, Defendants showed deliberate indifference to Ms. Lynch's known and substantial risks of sexual assault by failing to take reasonable steps to protect her, despite having the authority and ability to do so, even as she pleaded repeatedly for safekeeping.

152.   Each of the aforementioned Defendants directly participated in the Eighth Amendment violations alleged while acting under color of state law.

153.   showed deliberate indifference to Ms. Lynch's substantial risk of serious harm by, inter alia, participating in or ratifying the decision to exclusively place Ms. Lynch in male GDC facilities where she stood a heightened risk of sexual assault, even though there were female facilities that were a safe and appropriate alternative;

failing to take reasonable steps to protect Ms. Lynch from sexual assault at the men's facilities where she was placed; and failing to take action or authorize safety transfers after receiving numerous reports that Ms. Lynch had been repeatedly sexually abused and assaulted in multiple facilities as a result of their housing decisions.

154.   Defendants were deliberately indifferent to Ms. Lynch's substantial risk of serious harm from sexual assault by, inter alia, participating in the decision to house Ms. Lynch exclusively at men's prisons; failing to take reasonable measures to protect Ms. Lynch at their facilities, and failing to reasonably respond to the sexual abuse and harassment Ms. Lynch experienced at their respective facilities.

156.   Defendants showed deliberate indifference to Ms. Lynch's substantial risk of serious harm by, inter alia, failing to take reasonable steps to protect Ms. Lynch from assault despite their knowledge of the requirements of PREA compliance, and despite affirming in reports that the prisons in which Ms. Lynch were housed  were PREA compliant.

157.   Defendants showed  deliberate  indifference to  Ms. Lynch's substantial risk of serious harm by failing to protect her from sexual assault; disclosing confidential

PREA information concerning her transgender status in a manner intended to denigrate and arouse the anger of Ms. Lynch's fellow incarcerated people; and by sexually harassing, denigrating, and demeaning Ms. Lynch for being transgender in a manner intended to, and that did, increase her already substantial risk of sexual assault and violence motivated by transphobic hate.

158.   As a direct, proximate, and foreseeable consequence of Defendants' deliberate indifference, Ms. Lynch has been sexually assaulted and abused repeatedly. She also continues to face a substantial risk of assault and remains in constant fear for her safety.

159.   Defendants' actions and omissions have caused Ms. Lynch irreparable physical injury and emotional harm, including worsening PTSD and suicidal ideation and suicide attempts.

160.   Defendants, by and through their agent, Deputy Perry with Macon State Prison, went so far to as to threaten Ms. Lynch's transfer to a transitional center if she sought redress for the acts of violence and abuse committed against her, specifically and intentionally denying her relief that was guaranteed under both PREA and the United States Constitution.

161.   Ms. Lynch seeks damages against Defendants in their individual capacities. Ms. Lynch also seeks injunctive and declaratory relief against in their official capacities because their flagrant constitutional violations will continue indefinitely, absent injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Christina Alicia Lynch respectfully requests that this Court issue:

162. A declaratory judgment that Defendants'actions and omissions in failing to provide Ms. Lynch with minimally adequate treatment for her gender dysphoria violate the Eighth Amendment to the U.S. Constitution;

163.   A declaratory judgment that Defendants' actions and omissions in failing to protect Ms. Lynch from the substantial risk of serious harm from sexual assault violate the Eighth and Fourteenth Amendments to the U.S. Constitution;

164.   A declaratory judgment that the De Facto Placement Ban adopted and applied to Ms. Lynch by Defendants violates the Eighth and Fourteenth Amendments to the U.S. Constitution;

165.   A declaratory judgment that the Hormones-Only Policy adopted and applied to Ms. Lynch by Defendants violates the Eighth and Fourteenth Amendments to the U.S. Constitution;

166.   Preliminary and permanent injunctive relief restraining and enjoining the enforcement, operation, and execution of the De Facto Placement Ban within GDC by Defendants, their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them;

167.   Preliminary and permanent injunctive relief restraining and enjoining the enforcement, operation, and execution of the Hormones-Only Policy within GDC by Defendants, their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them;

168.   Preliminary and permanent injunctive relief requiring that Defendants and their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of

them take reasonable affirmative steps to protect Ms. Lynch from sexual assault in GDC custody, including transferring Ms. Lynch to a female facility to the extent it will safeguard her from ongoing sexual abuse;

169.   Preliminary and permanent injunctive relief requiring that Defendants and their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them provide Ms. Lynch medically necessary treatment for her gender dysphoria, including without limitation a treatment plan that includes:

a.   Uninterrupted access to hormone therapy, including blood work and monitoring to ensure her hormone levels are therapeutic and in the appropriate range;

b.   Accommodations for female gender expression (including female undergarments, commissary items, and grooming allowances);

c.   Access to hair removal treatments such as electrolysis, laser treatments, or depilatory creams;

d.   Regular appointments with healthcare providers qualified to treat gender dysphoria, so that her ongoing treatment needs can be appropriately assessed and managed;

170.   Compensatory damages against each Defendant named in his or her individual

capacity, in an amount adequate to compensate Plaintiff for her harms and losses;

171.   Nominal damages against each Defendant named in his or her

individual capacity;

172.   Punitive damages against each Defendant named in his or her individual

capacity in an amount to be determined;

173.   Reasonable attorney's fees and costs, including expert fees, under 42

U.S.C. § 1988; and

174.   All other relief that the Court deems just and proper.

Petition is true and correct to her attorney, the undersigned counsel.

Dated: <u>December 72, 2021</u>

*Lyra Foster*

Charles "Lyra" Foster
State Bar No. 121336

Charles "Lyra" Foster
120 Scott Blvd
Decatur, GA 30030
512-826-0411

Cfoster20@lawmail.mercer.edu

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

_____

**CHRISTINA LYNCH,**

        **Plaintiff,**

**v.**                                                        **Case No.**

**TIMOTHY WARD, individually and
in his official capacity as Commissioner
of the Georgia Department of
Corrections; SHARON LEWIS,
individually and in her official capacity
as the Statewide Medical Director of
the Georgia Department of
Corrections; JAVEL JACKSON,
individually and in her official capacity
as Director of Mental Health of the
Georgia Department of Corrections;
AHMED HOLT, individually and in
his official capacity as Assistant
Commissioner, Facilities Division, of
the Georgia Department of
Corrections;**

        **Defendants.**

_____

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that the Georgia Department of Corrections

and Georgia Department of Corrections Clinical Health department will be served

by eFile notice using PACER.

Dated: <u>December 72, 2021</u>

*Lyra Foster*
_____
Charles "Lyra" Foster
State Bar No. 121336

Charles "Lyra" Foster
120 Scott Blvd
Decatur, GA 30030
512-826-0411
Cfoster20@lawmail.mercer.edu

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

_____

**CHRISTINA LYNCH,**

        **Plaintiff,**

**v.**                                                                    **Case No.**

**TIMOTHY WARD, individually and in his official capacity as Commissioner of the Georgia Department of Corrections; SHARON LEWIS, individually and in her official capacity as the Statewide Medical Director of the Georgia Department of Corrections; JAVEL JACKSON, individually and in her official capacity as Director of Mental Health of the Georgia Department of Corrections; AHMED HOLT, individually and in his official capacity as Assistant Commissioner, Facilities Division, of the Georgia Department of Corrections;**

        **Defendants.**

_____

## MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION AND REQUEST FOR EMERGENCY HEARING

COMES NOW CHRISINA ALICIA LYNCH by and through counsel, and, without

waiving any objections or defenses, including service of process and jurisdiction,

makes this special appearance to file this, her Motion for Temporary Restraining Order and Injunction, showing the Court as follows:

## I.   <u>INTRODUCTION</u>

Christina Lynch is a transgender woman who—despite having successfully sued officials from the Georgia Department of Corrections ("GDC"), including Defendant Statewide Medical Director Sharon Lewis, for constitutional violations in 2015—is once again trying to survive brutal and unrelenting abuse and mistreatment. She is proceeding against the Georgia Department of Corrections for its failure to provide Constitutionally mandated medical care. Because gender dysphoria is a recognized and serious medical condition, she requires immediate equitable relief during the pendency of her action against the State.

## II.   <u>STATEMENT OF FACTS</u>

As set forth in the Complaint for Equitable Relief and Damages filed contemporaneously herewith, Ms. Lynch successfully sued the GDC in 2015 to obtain medical care for her diagnosed gender dysphoria. The GDC has completely failed to meet the obligations imposed on it by the settlement agreement it voluntarily entered into with Ms. Lynch or the recognized medical standards for treatment of gender dysphoria. Treatment for gender dysphoria includes permitting diagnosed individuals to live and present according to their gender identity. The state is currently threatening to enforce male grooming and presentation protocols against

Ms. Lynch, in violation of the standard of care recommended by the World Professional Association for Transgender Health. This standard is recognized by the 11th Circuit as *the* standard for treatment of gender dysphoria that is compliant with the Constitution's prohibitions on cruel and unusual punishment.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A. Temporary Restraining Order and/or Interlocutory Injunction

O.C.G.A. §9-11-65(b) states, in pertinent part:

> "A temporary restraining order may be granted . . . if: (1) . . . immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party . . . can be heard in opposition; and (2) The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required."

Ms. Lynch has already suffered immediate and irreparable harm as a result of actions by the adverse parties in this case, leading to self-harm, suicide attempts, and egregious neglect. She simply seeks the equitable relief that she was promised in 2015 and which has been mandated by the United States Constitution. She is not asking that this Court summarily grant her the medical treatment she seeks in her contemporaneous lawsuit, she prays that this court prevent the Defendants from taking active, affirmative steps against her such as cutting her hair or enforcing masculine dress codes. As explained at length in the contemporaneously-filed Complaint and in the Affidavit of Dr. Ren Massey (attached), what may seem to this

Court to be simple dress code enforcement is actually *legally, technically,* and *medically* cruel and unusual punishment under the United States Constitution. Therefore, this Court should issue a temporary restraining order enjoining the defendants from taking any actions to enforce male dress codes against Ms. Lynch.

This Motion will be served on the Defendants by electronic mail and eservice such that Defendants will have been provided with notice of this Motion and the relief sought. However, in accordance with O.C.G.A. §9-11-65(b), this Court may properly issue the requested TRO irrespective of notice as any delay in issuing such a temporary restraining order will only allow further harm to come to Ms. Lynch.

**B. Emergency Hearing Requested**

Following the entry of the requested TRO, Ms. Lynch requests an expedited emergency hearing on their request for an interlocutory and/or permanent injunction. "When . . . a party obtains a TRO without notice, a hearing on an interlocutory injunction shall take place 'at the earliest possible time and shall take precedence over all matters except older matters of the same character.'" *Smith v. Guest Pond Club, Inc.*, 277 Ga. 143, 586 S.E.2d 623 (2003), *quoting* O.C.G.A. §9-11-65(b).

Furthermore, should this Court not issue a TRO, HPY, its lawyers, and its clients request an expedited emergency hearing on HPY, its lawyers, and its clients' request for an interlocutory and/or permanent injunction, pursuant to Federal and State rules of procedure.

## C. Interlocutory and Permanent Injunction

Under O.C.G.A. §9-11-65, this Court has broad discretion to enter an interlocutory injunction to prevent irreparable damage to a party until a final hearing. *Treadwell v. Inv. Franchises, Inc.,* 273 Ga. 517, 519, 543 S.E.2d 729 (2001). A trial court should grant an interlocutory injunction to maintain the status quo until a final hearing if, by balancing the relative equities of the parties, it would appear that the equities favor the party seeking the injunction. *Ayer v. NorfolfTimber Inv., LLC,* 291 Ga. App. 409, 410, 662 S.E.2d 221 (2008). *See* also *Garden Hills Civic Ass'n v. Metro. Atlanta Rta,* 273 Ga. 280, 281, 539 S.E.2d 811 (2000). Equity favors the party seeking the injunction if greater harm would result by the refusal of interlocutory relief. *Metro. Atlanta Rapid Transit Auth. v. Wallace,* 243 Ga. 491, 494-495, 254 S.E.2d 822 (1979).

In deciding whether to grant an interlocutory injunction, the trial court should consider whether (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of his claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest. *SRB Inv. Servs., LLLP v. Branch Banking & Trust*

*Co.,* 289 Ga. 1, 5, 709 S.E.2d 267 (2011). The Court is vested with broad discretion in making its decision. *SRB Inv.*, *supra*, at 5.

First, as discussed above, there is a substantial threat that Ms. Lynch will suffer irreparable injury if the injunction is not granted and the Defendants' conduct is allowed to continue. Second, granting the injunction would not result in any harm to the Defendants. Third, there is more than a substantial likelihood that Ms. Lynch would prevail on the merits, as even a cursory review of Ms. Lynch's 2015 case and 11th Circuit case law regarding treatment of gender dysphoria shows that the Defendants have failed to perform their duties according to the law, a contract they voluntarily entered into, and in accordance with the United States Constitution. Additionally, Ms. Lynch wishes to refer this Court to ongoing investigations by the United States Department of Justice into the conditions and circumstances of the Georgia Department of Corrections. The patterns of arguably criminal neglect that the GDC is putting all of its wards through is recognized not just by inmates with gender dysphoria, nor State inmates in general, but by Federal law enforcement. The State simply cannot be allowed to continue its abuse of Ms. Lynch during pendency of her case.

This Court also can make the injunction permanent such that the protection from the Defendants' actions continues after disposition of the lawsuit. *Dortch v. Atlanta Journal*, 261 Ga. 350, 351, 405 S.E.2d 43 (1991) (trial court may reach a

final determination of the issues at hearing). As the Defendants have already proven that they will not keep their word nor follow their own recognized standards of medical care without compulsion of law to do so, Ms. Lynch prays that this Court provide such a permanent injunction.

## IV.   CONCLUSION

For far too long, the Defendants have failed to live up to the obligations they have imposed on themselves through contract, and which have been imposed on them by the Constitution. Ms. Lynch asks that this Court afford them relief from the State's injurious conduct.

Dated: <u>December 7, 2021</u>

_____<u>*S/ Christina Lynch*</u>_____
Christina Lynch

CC: Charles Foster
120 Scott Blvd
Decatur, GA 30030
512-826-0411
Cfoster20@lawmail.mercer.edu